Opinion issued February 12, 2009 









Opinion issued February 12, 2009















 

 

 








 

 








            

                                                

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

____________

 

NO. 01-07-01052-CV

____________

 

EVELYN LOCKETT, INDIVIDUALLY AND AS PERSONAL
REPRESENTATIVE OF THE HEIRS AND ESTATE OF CLIFFORD LOCKETT, DECEASED and ASHLEY
JACKSON AND TIMOTHY CARL JACKSON II, INDIVIDUALLY AND AS EXECUTORS OF THE ESTATE
OF GEORGETTA JACKSON, DECEASED, and TIMOTHY JACKSON, Appellants

 

V.

 

HB ZACHRY COMPANY, PHARMACIA CORPORATION, f/k/a
MONSANTO COMPANY, UNION CARBIDE CORPORATION and ROHM & HAAS COMPANY,
Appellees

 

 



On Appeal from the 149th District Court

Brazoria County,
 Texas








Trial Court Cause No. 44,732

 

 



O P I N I O N

 

          This case encompasses two distinct wrongful death
claims arising out of alleged occupational exposures to benzene.  Clifford
Lockett and Evelyn Jackson died of acute mylogenous leukemia. The Lockett heirs
sued the Pharmacia Corporation (formerly known as “Monsanto”), the H.B. Zachry
Company, and Union Carbide, among others, for negligence and gross negligence,
alleging that exposure to benzene at the defendants’ work sites caused
Lockett’s death. The Jackson heirs sued Rohm and Haas, among others, also for
claims arising out of occupational benzene exposure.  

          Monsanto, H.B. Zachry, and Union Carbide moved for
summary judgment against the Locketts, contending that they had produced no
evidence that Clifford Lockett was ever exposed to benzene at their work sites,
and thus had produced no evidence of causation.  Rohm and Haas moved for
summary judgment against the Jacksons, contending that Evelyn Jackson was its
borrowed servant and thus, under applicable worker’s compensation insurance
provisions, the Jacksons’ negligence claims are barred by the Texas Labor
Code.  It further moved for a no-evidence summary judgment on the Jacksons’ gross negligence claim.  

          The trial court granted the summary judgments,
which the Locketts and the Jacksons appeal.[1]  We conclude that the
Locketts produced no evidence that Mr. Lockett was exposed to benzene at the
defendants’ work sites.  We further conclude that the Texas Labor Code bars the
 Jacksons’ negligence claim against Rohm and Haas, and the trial court
properly granted summary judgment on their gross negligence claim.  We
therefore affirm the judgments.

I.       Standard of Review

 

          Lockett and Jackson’s appeals are factually
distinct and raise different issues.  They nevertheless share the same
procedural posture, and thus we set forth the standard of review common to both. 
We review a trial court’s summary judgment decision de novo. Bendigo
v. City of Houston, 178 S.W.3d 112, 113 (Tex. App.—Houston [1st Dist.]
2005, no pet.).  A trial court must grant a no-evidence motion for summary
judgment if: (1) the moving party asserts that there is no evidence of one or
more specified elements of a claim or defense on which the adverse party would
have the burden of proof at trial; and (2) the respondent produces no summary
judgment evidence raising a genuine issue of material fact on those elements.  See
Tex. R. Civ. P. 166a(i).  

          A court must grant a traditional motion for summary
judgment if there is no genuine issue as to any material fact and the moving
party is entitled to judgment as a matter of law on the issues expressly set
out in the motion or in an answer or in any other response.  See Tex. R. Civ. P. 166a(c).  We review the
evidence presented by the summary judgment record in a light most favorable to
the party against whom the summary judgment was rendered, crediting evidence
favorable to that party if reasonable jurors could, and disregarding contrary
evidence unless reasonable jurors could not.  Mack Trucks, Inc. v. Tamez,
206 S.W.3d 572, 582 (Tex. 2006) (citing City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005)).  

II.      The Lockett Appeal

          Mr. Lockett worked as a contractor at Monsanto’s
Luling plant from 1988 to 1998.   During part of that period—from 1992 to 1998—H.B.
Zachry employed Lockett while it was a general contractor for Monsanto.  Lockett’s
heirs allege he was exposed to benzene and benzene-containing products at the
Luling work site.  In 1987, Lockett worked briefly at the Union Carbide Plant
in Hahnville, Louisiana. Lockett’s heirs allege that he was exposed to benzene at
that location as well.  As to all of these defendants, the Locketts submit that
benzene exposure caused Lockett’s leukemia and subsequent death.

          The Locketts contend that the trial court erred in
granting Monsanto’s traditional and no-evidence motions for summary judgment
because: (1) a fact issue exists as to causation; (2) the court improperly
considered the testimony of three interested witnesses in support of Monsanto’s
motions; and (3) inconsistencies in testimony in support of Monsanto’s motions
preclude summary judgment.  With respect to H.B. Zachry, the Locketts further claim
that H.B. Zachry’s motion for summary judgment improperly adopted Monsanto’s
motion.  Finally, the Locketts contend that the trial court erred in granting
Union Carbide’s motion for summary judgment because they presented more than a
scintilla of evidence that Lockett was exposed to benzene while working for
Union Carbide and that this exposure caused his death.  

A.      Causation Standards

          We review causation in toxic tort cases for evidence of both general and
specific causation.  Merrell Dow Pharms. v. Havner, 953 S.W.2d 706, 714
(Tex. 1997).  “General causation is whether a substance is capable of causing a
particular injury or condition in the general population, while specific
causation is whether a substance caused a particular individual’s injury.”  Id.  Here, the defendants contend that the Locketts offered no evidence that Mr.
Lockett was exposed to benzene at their worksite, and thus that the Locketts
produced no evidence of specific causation.  

          The Texas Supreme Court set forth the guidelines
for assessing specific causation in Merrell Dow Pharmaceuticals, Inc. v.
Havner.  See 953 S.W.2d at 714–15.  Specifically, the Texas Supreme
Court held that, in cases like this one—in which no direct evidence of specific
causation exists—plaintiffs may rely on studies showing an increased risk of
their particular injury resulting from exposure to the substance at issue to
raise a fact question on causation.  Id. at 715.  The court explained:

In
the absence of direct, scientifically reliable proof of causation, claimants
may attempt to demonstrate that exposure to the substance at issue increases
the risk of their particular injury [by relying on epidemiological studies]. 
The finder of fact is asked to infer that because the risk is demonstrably
greater in the general population due to exposure to the substance, the
claimant’s injury was more likely than not caused by that substance.  Such a
theory concedes that science cannot tell us what caused a particular
plaintiff’s injury.  It is based on a policy determination that when the
incidence of a disease or injury is sufficiently elevated due to
exposure to a substance, someone who was exposed to that substance and exhibits
the disease or injury can raise a fact question on causation.

 

Id.

          Use of an increased risk to prove causation,
however, requires that a plaintiff show that he is “similar” to the individuals
in the study.  Id. at 720.  This showing includes proof that the injured
person was exposed to the same substance, that the exposure or dose levels were
comparable to or greater to those in the studies, that the exposure occurred
before the onset of injury, and that the timing of the onset of injury was
consistent with that experienced by those in the study.  Id.  Further,
if there are other plausible causes of the injury or condition that could be
negative, the plaintiff must offer evidence excluding those causes with
reasonable certainty.  Id. (citation omitted); see also Coastal Tankships,
U.S.A., Inc. v. Anderson, 87 S.W.3d 591, 602 n. 21 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (“The Supreme Court recognizes that it is possible
that a toxic-tort plaintiff may not be able to find reliable direct evidence of
specific causation.  A plaintiff in such a situation may be able to prove
specific causation circumstantially by taking general-causation evidence, such
as epidemiological studies, and showing he is similar to the studies’
subjects.” (citation omitted)).     

          The Texas Supreme Court recently affirmed, in Borg-Warner
Corp. v. Flores, that for a plaintiff to prove specific causation by
relying on an increased risk of developing a disease related to exposure, he
must show that the frequency and regularity of his exposure to the product is
comparable to, or greater than, that of the individuals in the studies upon
which he relies. 232 S.W.3d 765, 771–73 (Tex. 2007).  Thus, at the outset, we review
the summary judgment record for evidence that Mr. Lockett was exposed to
benzene at the defendants’ work sites.

B.      Monsanto








          Lockett worked at Monsanto’s Luling, Louisiana plant as an employee of an independent contractor for ten years, from 1988 to
1998.  Monsanto denies that Lockett was ever exposed to benzene while at the
Luling plant.  

          1.       Monsanto’s Summary
Judgment Evidence

          Monsanto produced the depositions of three Monsanto
employees as summary judgment evidence.  These employees testified that, during
the entire time Lockett worked at the Luling plant, Monsanto did not make
benzene at the Luling plant, benzene was not present at any of Lockett’s job
locations and, in fact, was not present at the facility at all.  

          First, Monsanto offered the testimony of Bruce
Eley, a former Monsanto corporate industrial hygenist, who had worked at Monsanto
since 1969, including during Lockett’s tenure.  When questioned about each
location where Lockett worked, Eley provided the following testimony:

                    Q:      All right.  Let me ask you
about a couple of the areas that Lockett worked at the Monsanto Luling plant.

 

First,
Roundup.  Was benzene involved in any way in that process, as a raw material,
as an intermediary, as a by-product, or as a waste product, or any other way
that you can think of?

 

                    A:      No.

 

                    Q:      What about EMA, another
place that Mr. Lockett worked?  Was benzene involved in the EMA manufacturing
process in any way, as a raw material, an intermediary, a by-product, or a
waste product?








 

                    A:      No.

 

. . .

 

                    Q:      [Lockett] also indicated
he worked at some time in the finished good– finished goods warehouse.  Was
benzene present in the finished goods warehouse between 1988–1998 time period? 

 

                    A:      To my knowledge, other
than background levels that you would have in a – in a plant, no.

 

                    Q:      [Lockett] also worked for
a short time at the end of his career there in the salvage yard.  Can you think
of any reason that there would be any benzene present in the salvage yard?

 

                    A:      No, I cannot.

 

                    Q:      And can you think of any
way – with respect to all of those units that [Lockett] worked at, can you
think of any way that [Lockett] could have been exposed to benzene above
background levels working at those units at the Luling plant?

 

                    A:      No, I cannot. 

 

          Upon subsequent questioning by appellant’s counsel,
Eley explained that he meant “background levels” of benzene as the amount
commonly present in air, water, and the human body.  

          Next, Monsanto offered the deposition testimony of
Fred Kokemor, a chemical engineer employed by Monsanto with 31 years of
experience at the Luling manufacturing plant, part of which overlapped with the
time of Lockett’s employment.  Kokemor testified as follows:

                    Q:      Now, has there ever been
any processes at this plant that involve benzene in any way?

 








                    A:      Yes.  Sir, the only
process we have that I am aware of, we used to make a product called
cyclohexanol and it was actually used as a raw material for making another
product here on site, another product being adipic acid, but the adipic acid
plant was shut down I think sometime in the late 1960’s, early ‘70’s.  But we
continued to make cyclohexanol for an external market and we did that until
about 1984.

 

                    Q:      Okay.

. . .

 

                    Q:      There was no more
cyclohexanol being made at this facility after 1983?

 

                    A:      After 1984, that’s correct
sir, sometime in ‘84, I can’t recall.

 

                    Q:      Okay.  No more phenol
being brought into the plant as a feed stock?

 

                    A:      No, no more phenol being
brought in.

          

. . .

 

                    Q:      Are you aware of any
benzene-containing materials that remained at the plant after 1984?

 

                    A:      No, I am not aware of any.

          

                    Q:      Now, assuming that
[Lockett] started working at this plant in 1988, it’s your testimony that the
cyclohexanol unit had been shut down between four and five years?

 

                    A:      Uh-huh, that’s correct.

 

                    Q:      Do you know of any way
that anyone working in this facility could have been exposed to benzene four or
five years after that unit was shut down?

 

                    A:      No, no, I am not aware of
any.

 

. . .

 

                    Q:      Are you familiar maybe to
a lesser degree with other processes that have been in place in this plant
during the 31 years that you have been here?

 

                    A:      Yes.

 

                    Q:      To your knowledge, has
benzene been involved in any way, shape, or form in any of the other processes
at this plant other than what you have discussed in connection with
cyclohexanol?

 

                    A:      No.  Benzene was not used
to my knowledge.

 

 

          Finally, Monsanto offered the testimony of Mike
Sander, a chemical engineer who had been involved in the manufacturing of
“Roundup” at the Luling plant for over 30 years.  Sander testified as follows:

                    Q:      Can you think of anybody
else at this plant who is in a better position than you to talk about the
Roundup manufacturing process?

 

                    A:      Not at this site, no.

 

. . .

 

                    Q:      Okay.  And during the
course of these 30 years that you have been working with the Roundup
manufacturing processes, have you become familiar with the raw materials that
go into the manufacturing of that product?

 

                    A:      Yes.

 

                    Q:      And have you become
familiar with the intermediate steps that are involved and the intermediate
products that result from those steps in manufacturing Roundup?

 

                    A:      Yes, particularly all the
ones we make here.

 

                    Q:      And the same question as
to by-products or waste products or the finished product, have you become
familiar with all of those?

 

                    A:      Yes.

 

. . .

 

                    Q:      Just to kind of wrap up
this area of questioning, let me just ask you, is benzene involved in any way
in the manufacturing of Roundup as a raw material, an intermediate, a
by-product, a contaminant, a waste product, or a finished product?

 

                    A:      No, it’s not.

 

                    Q:      And are you certain of
that?

 

                    A:      Yes.

 

                    Q:      Can you conceive of any
way that a person working in any of the Roundup units could be exposed to
benzene?

 

                    A:      No.

 

          2.       The
Locketts’ Evidence Relating to Exposure at Monsanto

          To support their allegation that Lockett was
exposed to benzene, the Locketts rely on the deposition of his former co-worker,
Monsanto employee David Diggs, who testified that there was a “possibility”
that benzene was present.  Diggs’ testimony, in pertinent part, was as follows:

          Q:      Did you ever see [Lockett], you,
with your own eyes, see [Lockett] working with any material that you knew to be
benzene?

 

          . . .

 

          A:      The fair way to answer that question
would be him working with all the raw materials back there in the different
ways that they use it, or he used it, you know, for to do his job, is very
possible that, you know, it was some small portions of benzene that he came
into contact with unintended.  

 








          The Locketts also offered the expert reports of Frank
Gardner, a toxicologist, and Frank Parker, an industrial hygienist.  Gardner’s report attributed Lockett’s cause of death to acute mylogeneous leukemia caused
by benzene and solvent exposure.  The report indicates that Gardner’s opinion
is based on medical records, a letter from the Lockett survivors’ counsel
outlining Lockett’s occupational exposures, and an affidavit from Lockett’s
daughter.  Parker concluded, based on his training and on his review of the testimony
of Edwards and Diggs, that Lockett was exposed to benzene at Monsanto.   

          Finally, the Locketts offered various Material
Safety Data Sheets (MSDS) and treatises acknowledging the link between benzene
and solvent exposure and acute mylogenous leukemia.  The Locketts also proffered
2001 environmental indicator testing done for benzene and other contaminants.  The
Locketts assert in their brief that this report covers the years Lockett worked
at the Monsanto facility in Luling, but the dates on the face of the report do
not confirm this assertion.  More important, the report concludes that no
exposure to humans, and particularly plant workers, can “reasonably be expected
under the current land and ground-water use conditions.”  Thus, the report does
not link benzene exposure to Mr. Lockett.

3.    
Application of Causation
Analysis and Summary Judgment Standard

 

          The Locketts allege that Monsanto’s motion for
summary judgment fails because the Monsanto witnesses offered “conflicting and
controverting” testimony. The Locketts point to portions of industrial
hygienist Eley’s testimony indicating that contractors used solvents,
degreasers, and cleaners on the premises.  According  to that testimony, one of
these brands was “Safety Kleen.”  The Locketts claim that “Safety Kleen”
contained benzene derivatives, but do not cite any evidence supporting this
claim, or that Lockett ever came into contact with Safety Kleen or any
benzene-containing product.  

          Similarly, the Locketts assert that chemical
engineer Sander testified that he recalled solvents used at the plant, including
mehyl ethyl ketone.  The Locketts argue that this product is a “aromatic
hydrocarbon compound” and that there is a “positive association between
leukemia and solvent exposure,” but, again, the Locketts fail to cite to any
evidence in the record supporting this claim or showing that Lockett ever used
such a product.  Sander testified that he had heard of methyl ethyl ketone, but
did not remember it ever being used at the Luling plant.  The Locketts also
claim that chemical engineer Kokemore acknowledged that solvents and phenol, a
product made from benzene, were used at the facility and that he had seen
Safety Kleen trucks on site at Monsanto.  Kokemore also testified that phenol
was brought into Monsanto by rail car and barge load.  Kokemore also plainly
stated, however, that phenol was no longer present at the Luling plant after
1984—four years before Lockett’s employment.

          We hold that the Locketts have failed to offer any evidence
that shows that Mr. Lockett was ever exposed to benzene at the Monsanto site. 
The testimony of Diggs about a “possibility” that Lockett was exposed to
benzene is not competent summary judgment evidence sufficient to raise a fact
issue for a jury.  Further, Diggs’s deposition fails to identify any particular
instance, or any product or process, by which Lockett was exposed to benzene.  As
stated by the Texas Supreme Court, “[w]hen the evidence offered to prove a
vital fact is so weak as to do no more than create a mere surmise or suspicion
of its existence, the evidence is no more than a scintilla and, in legal
effect, is no evidence.”  Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  Here, the only attempt the Lockett survivors make to quantify the dose of
benzene to which Lockett was allegedly exposed is through the testimony of
David Diggs.  Diggs testified there was a possibility that Lockett came into
contact with “some small portion of benzene.” Parker’s report noted that
Lockett’s exposure varied from “none” to “well in excess of contemporary
standards,” but no factual basis exists in the record to draw this conclusion
with respect to the Mosanto plant.

          Similarly, Parker and Gardner’s reports and the
MSDS Data Sheets provide no evidence indicating that Lockett was exposed to
benzene at all, much less in adequate doses to cause his illness. Although the
reports establish a link between benzene and leukemia generally, they are
silent on the issue of whether benzene was present at the Luling plant from
1988–1998, nor whether Lockett was ever exposed to benzene at a level and duration
necessary to be a contributing cause of his mylegenous leukemia.  See Borg-Warner
Corp. v. Flores, 232 S.W.3d 765, 770--73 (Tex. 2007).

          Without proof of any exposure to benzene, we hold that the
trial court properly ruled that the Locketts failed to raise a fact issue as to
specific causation as to their claims against Monsanto. 

C.      H.B. Zachry








          Lockett worked as an employee of H.B. Zachry
Company at the Monsanto plant from 1992–1998.  H.B. Zachry moved to adopt and
join Monsanto’s motion for summary judgment on the theory that Monsanto’s
arguments were equally applicable to H.B. Zachry as Lockett’s employer.  The
trial court granted H.B. Zachry’s motion.  The Lockett survivors contend that
H.B. Zachry’s adoption of and joinder with Monsanto’s motion for summary judgment
was improper.  

          Rule 58 of the Texas Rules of Civil Procedure allows
a party to adopt another party’s pleadings by reference.  Tex. R. Civ. P. 58.  The Rule provides,
in relevant part, that “statements in a pleading may be adopted by reference in
a different part of the same pleading or in another pleading or in any motion .
. . .”  Id. 

          Texas courts have recognized adoption of a
co-party’s motion for summary judgment as a procedurally legitimate practice.  See,
e.g., State ex rel Grimes County Taxpayers Ass’n v. Tex. Mun. Power Agency,
565 S.W.2d 258, 264 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ dism’d)
(holding that intervenors “sufficiently adopted the allegations of the
[defendant’s] motion for summary judgment.”). In Chapman v. King Ranch, Inc.,
a group of defendants joined and adopted the motion for summary judgment of a
single co-defendant, the King Ranch.  41 S.W.3d 693 (Tex. App.—Corpus Christi
2001), rev’d on other grounds, 118 S.W.3d 742 (Tex. 2003).  The Corpus
Christi Court of Appeals held that the trial court did not err in “allowing
[the defendants] to adopt and incorporate, as their grounds for summary
judgment, the grounds for summary judgment alleged by their co-defendants.”  Id. at 700.  The court wrote:

This
rule [Rule 166a(c)] does not say that a defendant cannot adopt and incorporate
by reference as its grounds for summary judgment the summary judgment grounds
alleged by a co-defendant [.]  All of these defendants, including the
appellees, have a community of interest and identical defenses to appellants’
claims [.]    

. . .

 

Appellees’
joinder in and adoption of King Ranch’s summary judgment motion gave appellants
notice of the grounds upon which they sought summary judgment.  Because of the
voluminous exhibits and evidence involved in this case along with the common
interest and defenses of the appellees, we perceive no problem with allowing
the appellees to adopt and incorporate by reference the grounds for summary
judgment alleged by King Ranch.

 

Id. at 699–700.  The
Texas Supreme Court later affirmed this summary judgment. King Ranch,
118 S.W.3d at 757–58.  

          The Locketts rely on Youngstown Sheet & Tube
Co. v. Pennsylvania, 363 S.W.2d 230 (Tex. 1962) in support of their
position that H.B. Zachry’s adoption of Monsanto’s motion for summary judgment
was improper.  In Youngstown, the issue was whether an affidavit could
incorporate two agreements involved in the case.  The Court allowed an
affidavit to incorporate one of the agreements because it had been attached to
a party’s answer and was incorporated by reference in the affidavit without
objection.  Youngstown, 363 S.W.2d at 234.  With regard to the second agreement,
the Court ruled that it could not be incorporated, because it had not been
attached to any answer, pleading, or other motion that had been filed with the
trial court.  Id.  In contrast, here, H.B. Zachry did not seek to
incorporate matters not already a part of the judicial record.

          As in Chapman, these defendants share a
“community of interest and identical defenses” to Lockett’s claims.  Chapman,
41 S.W.3d at 699.  If Lockett was not exposed to benzene while working at the
Monsanto facility in Luling, he could not have been exposed to benzene while in
the employ of H.B. Zachry at the Luling facility.  The arguments and evidence
raised in Monsanto’s motion for summary judgment were equally applicable to
H.B. Zachry.  As in Chapman, H.B. Zachry’s adoption of Monsanto’s motion
for summary judgment gave the Lockett survivors fair notice of the grounds for summary
judgment.  Consequently, we hold that H.B. Zachry’s adoption of Monsanto’s
motion for summary judgment was proper.  For the same reason we affirm the trial
court’s summary judgment in favor of Monsanto, we likewise affirm the trial
court’s summary judgment in favor of H.B. Zachry.   

D.      Union Carbide

          Lockett worked as an independent contractor at
Union Carbide’s Taft facility for an uncertain time period of three months to
12 months sometime during 1987.  As part of his work on a demolition project
with a company called Ark Wrecking, Lockett drove forklifts, picked up
materials, and scrapped pipe, while other members of the crew dismantled it. The
Locketts claim that Mr. Lockett suffered exposure to benzene at the Taft facility.
In its no-evidence summary judgment, Union Carbide asserted, among other
grounds, that the Locketts could not recover because they presented no evidence
that Mr. Lockett was exposed to any significant level of benzene at its
worksite.[3]

                   1.       The Summary Judgment Evidence

          The Locketts responded to Union Carbide’s no-evidence
motion with the testimony and affidavit of Kenneth Edwards.[4] 
In his deposition, Edwards testified that, while at Ark Wrecking, he worked
with Lockett for six to eight months at the Taft facility.  According to
Edwards, Ark Wrecking employees dismantled a unit at the Taft facility.  During
one day, Edwards watched Lockett and other Ark Wrecking employees work around
what Edwards called the “No. 3 complex” as well as a “benzene unit.”  Though
Edwards believed that the work would have taken more than one day, he did not
see the contractors work in that area other than that day.  When pipe was being
cut in that area, Edwards saw men hold a leather sack over the pipe to catch
sparks, which implied to Edwards that flammable chemicals were present.  Edwards
testified in his deposition that he and Lockett smelled chemicals while doing their
work.  Edwards thought he smelled benzene, but conceded that there were many
smells, that many chemicals smelled alike, and that he was not a chemist.  Edwards
further admitted that he did not know whether any benzene unit was operating at
the plant.  

          The Locketts also offered an affidavit from
Edwards, signed slightly more than a month before his deposition.  In his
affidavit, Edwards discussed his belief about Lockett’s exposure to benzene:

I
believe [Lockett] was exposed to benzene and benzene-consuming products and
materials at the Union Carbide Hahnville, Louisiana plant.  I worked in close
proximity to [Lockett] and performed similar job duties as he did.  I saw
[Lockett] in the area where I believe benzene was present.  [Lockett] inhaled
the benzene fumes on a continuous basis.  

 

          In addition to Edwards’s testimony and affidavit,
the Lockett survivors submitted diagrams of the Taft plant showing the
existence of a benzene unit at one time.  Benzene was a component of one Union
Carbide byproduct called “Dripolene.”  Dripolene’s Material Safety Data sheet,
also submitted by the Locketts, reveals that Dripolene can be composed of 25%
to 50% benzene.  A 1982 industrial hygiene survey reported that benzene had existed
at the Taft facility, and a 1977 report identified “a potentially significant
benzene-related occupational health problem” near the Taft facility.  

                   2.       Application to Causation
Standards

          The Lockett survivors’ evidence does not indicate
that any benzene existed at the facility at any time after 1982, much less near
1987, when Lockett was working there, or that, even if benzene was present at
the facility, that Lockett’s work exposed him to it.  Edwards’ testimony that
he suspected benzene was present due to sparking and odor does not raise an
issue of fact that Lockett was exposed to benzene in a quantity and duration sufficient
to be a contributing cause of his disease.  See Borg-Warner, 232
S.W.3d at 770.  There is no evidence in the record that supports a reasonable
inference that a dangerous level of benzene existed at the Taft facility when Lockett
was working there in 1987, or at any time following 1982, or that Lockett’s
work there otherwise exposed him to a significant level of benzene.  Consequently,
we hold that the trial court did not err in granting Union Carbide’s
no-evidence motion for summary judgment on causation.

III.    The Jackson Appeal

          We turn to the Jackson survivors’ appeal.  Jackson worked as a laboratory chemist at Rohm and Haas’s worksite in Deer Park, Texas, but was nominally employed by Certified Technical Services (“CTS”).  From the fall
of 1992 to June 1994, she handled and oversaw the distribution of various
chemicals. Jackson’s survivors allege that her death resulted from occupational
exposure to benzene, and sued Rohm and Haas on theories of products liability,
premises liability, negligence, and gross negligence.  

          Rohm and Haas moved for partial summary judgment,
asserting that Ms. Jackson was its “borrowed servant” as a matter of law during
the time she worked at Rohm and Haas.  The trial court granted the motion, and
subsequently, granted Rohm and Haas’s traditional motion for summary judgment
on the issue of gross negligence.  The Jacksons contend that (1) Rohm and Haas
is not entitled to immunity pursuant to the Texas Workers Compensation Act
because Jackson was not the borrowed employee of Rohm and Haas, and (2) the
trial court erred in granting Rohm and Haas’s summary judgment on the issue of
gross negligence.








          A.  Employment and Borrowed Employee

          The Texas Supreme Court has long recognized that a
general or regular employee of one employer may become the borrowed employee of
another.  St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 537 (Tex. 2003) (citing Sparger v. Worley Hosp., Inc., 547 S.W.2d 582, 583 (Tex. 1977)), and Producers Chem. Co. v. McKay, 366 S.W.2d 220, 225 (Tex. 1963).  Borrowed employee status hinges on whether the other employer or its agents
have the right to direct and control the employee with respect to the details
of the particular work at issue.  Id.  

          Rohm and Haas contends that Jackson was acting as
its borrowed employee when she worked at its facility from the fall of 1992 to
June 1994, and as such, her heirs are not entitled to assert negligence,
premises liability, and products liability claims, as the exclusive remedy
provisions of the Texas Workers’ Compensation Act (“TWCA”) preclude these
claims.  We agree.

          An employer under the TWCA is protected by the
exclusive remedy provision, which bars common-law causes of action claims by
its injured employees.  See Tex. 
Lab. Code Ann. §408.001 (Vernon 1996).  Rohm and Haas subscribed to
workers’ compensation insurance in Texas when Jackson worked at its site.[5] 
The TWCA defines “employer” as “unless otherwise specified, a person who makes
a contract of hire, employs one or more employees, and has workers’
compensation insurance coverage.”  Tex.
Lab. Code Ann. §401.011(18) (Vernon 1996).

          To determine whether a workers’ compensation
insurance policy covers a worker’s injury, we review whether the subscribing
company is the worker’s employer under the right-to-control test.  Texas Workers’ Comp. Ins. Fund v. Del Indus., Inc., 35 S.W.3d 591, 595 (Tex. 2000).  That is, a general employee of one employer becomes the borrowed employee of
another “employer” if the other special employer has the right to direct and
control the employee with respect to the details of the particular work at
issue.  Flores v. N. Am. Techs. Group, Inc., 176 S.W.3d 442, 448
(Tex. App.—Houston [1st Dist.] 2004, pet. denied).  The test examines whether
the borrowing employer has the right to control the progress, details, and
methods of operations of the work.  Id. at 448–49 (citing Limestone
Prods. Distrib., Inc. v. McNamara, 71 S.W.3d 308, 312 (Tex. 2002)), and Farrell
v. Greater Houston Transp. Co., 908 S.W.2d 1, 3 (Tex. App.—Houston [1st
Dist.] 1995, writ denied)).  The borrowing employer must control not merely the
end sought to be accomplished, but also the means and details of its
accomplishment.  Id. at 449 (citing Thompson v. Travelers Indem. Co.,
789 S.W.2d 277, 278 (Tex. 1990)).  

          Numerous courts have upheld a trial court’s grant
of summary judgment in favor of an employer when no genuine issue exists as to
the employer’s right to control the plaintiff.  See, e.g., Garza v. Exel
Logistics Inc., 100 S.W.3d 280, 287 (Tex. App.—Houston [1st Dist.] 2002)
(affirming trial court’s summary judgment where evidence indicated that company
had right to control plaintiff), rev’d on other grounds, 161 S.W.3d 472
(Tex. 2005); Rodriguez v. Martin Landscape Mgmt., 882 S.W.2d 602, 604
(Tex. App.—Houston [1st Dist.] 1992, no writ) (upholding summary judgment in
favor of management company where summary judgment evidence established it had
right to control plaintiff); Gibson v. Grocers Supply Co., Inc., 866
S.W.2d 757, 760 (Tex. App.—Houston [14th Dist.] 1993, no writ) (upholding
summary judgment where evidence established company had right to control details
and manner in which plaintiff performed his job); Marshall v. Toys-R-Us
Nytex, Inc., 825 S.W.2d 193, 196–97 (Tex. App.—Houston [14th Dist.] 1992,
writ denied) (upholding summary judgment where evidence established that
company had right to control employee at time of accident, albeit as temporary
employer); Chapa v. Koch Ref. Co., 985 S.W.2d 158, 161 (Tex. App.—Corpus
Christi 1998), (upholding summary judgment because plaintiff served as
defendant’s borrowed servant), rev’d on other grounds, 11 S.W.3d 153
(Tex. 1999).

          Here, the Jackson survivors respond that Rohm and
Haas did not provide sufficient control over Jackson for her to be classified
as Rohm and Haas’s borrowed servant.  But, in Jackson’s deposition, taken
before her death, she admitted that: (1) she worked for Rohm and Haas; (2) she
received all of her work orders from Rohm and Haas; (3) she received job
training from a Rohm and Haas supervisor; (4) she spoke with Rohm and Haas
employees when she had a question or concern; (5) all of her dealings were with
Rohm and Haas; and (6) she received safety gloves from Rohm and Haas.








          The Jacksons observe that, when CTS hired Jackson, she was already experienced in chemistry lab work; therefore, Rohm and Haas did
not have to train her to operate a gas chromatograph.  The Jacksons also note
that Rohm and Haas provided Jackson with an “orientation” with respect to her
new work situation, rather than training, which does not amount to control over
 Jackson for the purposes of the borrowed servant theory.  Finally, they point
to a portion of Ms. Jackson’s deposition testimony in which she stated that she
considered herself a contractor.  

          Jackson’s testimony shows that Rohm and Haas, as
the borrowing employer, had the right to control the progress, details, and
methodology of her work.  Limestone Prods. Distrib., Inc. v. McNamara,
71 S.W.3d 308, 312 (Tex. 2002); Farrell v. Greater Houston Transp. Co.,
908 S.W.2d 1, 3 (Tex. App.—Houston [1st Dist.] 1995, writ denied.)  Jackson’s subjective statement that she considered herself a contractor does not outweigh
her testimony that she took all of her work orders from Rohm and Haas.  Indulging
every reasonable inference in the Jacksons’ favor, we hold that the evidence
demonstrates no genuine issue of fact that Rohm and Haas controlled the details
of Jackson’s work and thus satisfies, as a matter of law, that Jackson was the borrowed employee of Rohm and Haas.  Flores, 176 S.W.3d at 451.  Hence,
the trial court correctly ruled Rohm and Haas was an employer for purposes of
asserting the exclusive remedy provision of the TWCA.

          B.  Gross Negligence Claim

          The Jacksons next claim that the trial court erred
in granting summary judgment in favor of Rohm and Haas on the issue of gross
negligence.  Specifically, the Jacksons argue that Rohm and Haas failed to
effectively protect Jackson from the cancer-causing chemicals that she allegedly
was exposed to during the course of her work.  This failure, the Jacksons claim, rose to the level of grossly negligent conduct, justifying exemplary
damages against Rohm and Haas as Jackson’s employer.

          Chapter 41 of the Texas Civil Practice and Remedies
Code governs claims for exemplary damages.  A plaintiff may recover exemplary
damages if he or she “proves by clear and convincing evidence that the harm
with respect to the claimant seeks recovery of exemplary damages results from
(1) fraud; (2) malice; or (3) gross negligence.”  Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon Supp. 2008).  Gross negligence includes two elements: (1) viewed objectively from
the actor’s standpoint, the act or omission must involve an extreme degree of
risk, considering the probability and magnitude of the potential harm to
others, and (2) the actor must have actual, subjective awareness of the risk
involved, but nevertheless proceed in conscious indifference to the rights,
safety, or welfare of others.  Mobil Oil Corp. v. Ellender, 968 S.W.2d
917, 921 (Tex. 1998).  Evidence of simple negligence is not enough to prove
either the objective or subjective elements of gross negligence.  Id.  Under the first element, “extreme risk” is not a remote possibility of injury
or even a high probability of minor harm, but rather the likelihood of serious
injury to the plaintiff.  Id.  Under the second element, actual
awareness means that the defendant knew about the peril, but its acts or
omissions demonstrated that it did not care.  Id.  Circumstantial
evidence is sufficient to prove either element of gross negligence.  Id.

          “Clear and convincing” means “the measure or degree of proof
that will produce in the mind of the trier of fact a firm belief or conviction
as to the truth of the allegations sought to be established.”  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2). 
Thus, to prevail, Jackson’s survivors must show that Rohm and Haas committed an
action that involved an extreme degree of risk, and that it exhibited conscious
indifference to the rights, safety, or welfare of Jackson.  Rohm and Haas, as
the movant for summary judgment, must show no genuine issue of material fact
exists as to these issues.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548–49 (Tex. 1985).

          As part of her work at the Rohm and Haas facility, Jackson used gas chromatographs to perform tests on butadiene bombs in a laboratory.  Jackson also analyzed unknown samples to determine the chemicals present in the samples.  The
Jacksons allege that she did not work under an exhaust vent hood, though vent hoods
existed on the outer walls of the lab which functioned to draw air out of the
laboratory.  Jackson testified that no one wore a respirator in the lab.  Jackson also testified that, because she was working with unknown chemicals at Rohm &
Haas, she “worked a lot under the hood” because she “had to be very safe.”  

          When asked if she came into any direct contact with
benzene, Jackson replied that she was in direct contact with butadiene because
she tested the bombs, and that she “worked around” benzene.  The Jacksons also attached a report from Frank H. Gardner, M.D., a doctor of hematology and
oncology.  The doctor’s report reflected his belief that Jackson’s acute
myelogenous leukemia was predominantly associated with her exposure to butadiene
in the workplace, but it did not specify the Rohm and Haas facility.  The Jacksons also submitted evidence in the form of public data reports from 1992 through 1994
listing benzene as a chemical produced at the facility and manufactured as an
impurity.  The Jacksons state that Rohm and Haas submitted these reports to the
Environmental Protection Agency.  Finally, the Jacksons included a report
providing analyses of mortality patterns among petroleum refinery and chemical
plant workers.  

          In response, Rohm and Haas contends that this
evidence does not meet the standard set forth in Chapter 41 of the Texas Civil
Practice and Remedies Code for gross negligence.  Further, Rohm and Haas
contends that Jackson’s deposition demonstrates that Rohm and Haas provided Jackson with a safe working environment. 

          Upon review of the record, we conclude that the Jacksons have not raised a fact issue as to whether Rohm and Haas had an actual,
subjective awareness of a risk to Jackson, but nonetheless proceeded with
conscious indifference to her rights, safety, and welfare.  During her
deposition, Jackson acknowledged that she always wore gloves while working at
the Rohm and Haas facility.  Jackson also stated that she always worked under a
ventilated hood when she was working with chemicals.  As previously noted, Jackson’s deposition testimony does not indicate that she was directly exposed to benzene. 
The Jacksons offer no internal industrial hygiene reports, documents,
testimony, employee monitoring results, or other evidence that Rohm and Haas
processed dangerous levels of benzene at the lab, or that it consciously
ignored a risk to its employees from such an exposure.  Cf. Ellender,
968 S.W.2d at 922–25 (holding Mobil Oil’s actual awareness of extreme risk
benzene exposure involved and conduct in failing to warn contract workers about
benzene exposure or protect them from it constituted legally sufficient
evidence of Mobil Oil’s gross negligence). None of the summary judgment
evidence identifies any acts or omissions by Rohm and Haas evidencing a
conscious indifference to an extreme risk of harm to Jackson.  Diamond
Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 173 (Tex. 2005).  Accordingly, the
trial court properly granted summary judgment on the Jackson survivors’ gross
negligence claim against Rohm and Haas.

 

 

 

 

Conclusion

Based on the foregoing reasons, the
trial court properly granted summary judgment.  We therefore affirm the judgment
of the trial court.

 

 

 

                                                          Jane Bland

                                                          Justice

 

Panel consists of Judges Jennings, Bland, and Hudson.[6]

 

 









[1] The other entities that were defendants in the trial court are not
parties to this appeal.





[3] The trial court also granted summary judgment against the Locketts’
claims of gross negligence, exemplary damages, and conspiracy.  The Locketts do
not challenge these rulings on appeal.





[4]  Union Carbide also later presented portions of Edward’s deposition as
summary judgment evidence.





[5] The Jacksons objected to Rohm and Haas’s summary judgment evidence,
including certain portions of Jackson’s deposition testimony, a business
records affidavit from Rohm and Haas’s records custodian, and copies of the
declarations pages of Rohm and Haas’s workers compensation insurance policies
from the years Jackson worked at Rohm and Haas on the grounds that these items
constituted inadmissible hearsay.  The Jacksons also objected to the
declarations pages specifically, arguing they were not evidence of the terms of
the policy.  However, the Jacksons never obtained a ruling on those objections. 
Accordingly, the Jacksons have waived these objections.  Tex. R. App. P. 33.1(a); Chapman
Children’s Trust v. Porter & Hedges, L.L.P., 32 S.W.3d 429, 436 (Tex.
App.—Houston [14th Dist.] 2000, pet. denied).





[6] The Honorable J. Harvey Hudson, retired Justice, Fourteenth Court of
Appeals, participating by assignment.