**Opinion issued January 15, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00995-CV

————————————

**SHEIK EJAZ AHMED, M.D., FAYAZ FAIZ, M.D., IGNAZIO G. LACHINA, M.D., ALAK RAY, M.D., SALIM GOPALANI, M.D., ABDUL ALI, M.D., AND MIGUEL TAN, M.D., INDIVIDUALLY AND ON BEHALF OF NORTHWEST DOCTORS PLAZA, LTD., SALEHA RIAZ AHMED, FAF HOLDING, INC., AND ISHAQ, INC., Appellants**

**V.**

**PANKAJ SHAH, M.D., ADEEL ZAIDI, STEPHEN KOCH, M.D., PRESTIGE CONSULTING, INC. D/B/A TURN-AROUND MANAGEMENT GROUP., A.K. CHAGLA, SOHAIL NOOR, M.D., ANIL ODHAV, M.D., AND PALLAVOLVU REDDY, M.D., Appellees**

---

On Appeal from the 157th District Court
Harris County, Texas
Trial Court Case No. 2011-08100

---

**MEMORANDUM OPINION**

This dispute arises from failed investments in a medical clinic. Seeking to establish a long-term acute-care hospital (LTACH) in Northwest Houston, Sheikh Ejaz Ahmed, M.D., Fayaz Faiz, M.D., Ignazio G. Lachina, M.D., Alak Ray, M.D., Salim Gopalani, M.D., Abdul Ali, M.D., and Miguel Tan, M.D., individually and on behalf of Northwest Doctors Plaza, Ltd., Saleha Riaz Ahmed, FAF Holding, Inc., and Ishaq, Inc. (the Northwest Doctors), collectively invested approximately $1.8 million in Apex Long Term Care, L.P., located in Katy, Texas, after allegedly receiving oral assurances from the appellees that the money would be used for development of the Northwest location.

The Northwest Doctors sued Apex's original investors—Pankaj Shah, M.D., Adeel Zaidi, Stephen Koch, M.D., Prestige Consulting, Inc. d/b/a Turn-Around Management Group, A.K. Chagla, Sohail Noor, M.D., Anil Odhav, M.D., and Pallavolvu Reddy, M.D.—for civil conspiracy, common-law and statutory fraud, fraudulent inducement, negligent misrepresentation, conversion, and theft.[1] They sought relief under an unjust enrichment theory and actual and exemplary damages.

The parties moved for summary judgment, and the trial court signed a summary judgment in favor of the original investors. On appeal, the Northwest

---

[1] Shah, Koch, and Zaidi were general partners in Apex. The remaining appellees were limited partners.

Doctors contend that the trial court erred in granting summary judgment on their claims for fraud and unjust enrichment. We affirm.

## Background

The Northwest Doctors include seven individual doctors, a doctor's spouse, and three affiliated entities who invested in Apex.

In 2007, the Northwest Doctors entered into discussions with Apex's original investors concerning their interest in establishing an LTACH in Northwest Houston. Because federal health care law had placed a moratorium on issuing new LTACH licenses, the parties discussed transferring units from Apex's existing LTACH in Katy to establish the Northwest Houston LTACH.

According to the Northwest Doctors, Shah and Koch, on behalf of the original investors, orally agreed to segregate the Northwest Doctors' investments in a separate bank account dedicated solely to development of the Northwest Houston LTACH. Shah and Koch, the doctors testified, also assured them that their investments would be returned if the Northwest Houston LTACH project did not come to fruition. These representations do not appear in any of the written documents memorializing the investments.

After the initial meeting, several of the Northwest Doctors entered into three letters of intent (LOIs) with Apex, including a final letter that required Apex to

enter into a lease agreement with the Northwest Doctors at the proposed Northwest Houston LTACH location.

Pursuant to the final LOI, the Northwest Doctors entered a lease agreement with Apex. Under the lease, the doctors were required to obtain an unconditional release from their current tenant and to purchase at least 150 investment units in Apex.

Section 8.4 of the lease agreement stated that the funds would be deposited into Apex's operating account; it did not mention any separate account. The lease agreement also contained the following provisions:

> **Section 8.3 Amendments; Binding Effect**. This Lease may not be altered, changed, amended, modified, renewed or extended, except by an instrument in writing signed by the parties hereto.

> **Section 8.17 Entire Agreement**: This Lease and the Schedules, Addenda, and Exhibits attached hereto constitute the entire agreement and understanding of Lessor and Lessee with respect to the highest subject matter hereof . . . hereby DISCLAIM and NEGATE any and all statements, projections, understandings, agreements, covenants, representations, and warranties, express or implied, between Lessor and Lessee, for themselves and on behalf of their Related Parties, or set forth in any document or writing delivered or made available prior to the execution and delivery of the Lease.

In mid-2008, the Northwest Doctors purchased partnership units in Apex and thereby became limited partners with the original investors and subject to the Apex Limited Partnership Agreement. The partnership agreement required deposit of investment funds into Apex's account, to be used exclusively "for the business

4

of the Partnership (including distributions to the Partners)." The partnership agreement further recites that "[n]o Partner shall have the right to withdraw, reduce, or demand the return of its [c]apital [c]ontributions except as provided in this [a]greement." The partnership agreement also contained the following clause:

> **12.7. Entire Agreement**. This Agreement supersedes any prior understandings or agreements, whether written or oral, among the Partners with respect to the subject matter hereof and constitutes the entire understanding and agreement among the Partners with respect to the subject matter hereof, and there are no agreements, understandings, restrictions, representations or warranties among the Partners other than those set forth herein.

The partnership agreement includes an addendum entitled "RISK FACTORS," which contains disclosures warning prospective investors:

> The Partnership is in the development stage and has limited financial or operating history upon which to estimate its prospects for success. At the present time, the Managing Partner anticipates that the Partnership will generate significant losses. Intervening events related to construction, legal requirements, financing, and unforeseeable actions may further delay or potentially prevent construction and licensure of the Hospital. There can be no assurance that such losses will be eliminated or that if the Partnership eventually operates the Hospital, the Partnership will successfully penetrate the market for its targeted patient population, attain the necessary payor mix or ever produce significant levels of revenues to achieve sustainable profitability. In addition, the Hospital may fail to (i) attract sufficient numbers of patients, (ii) meet the formal and informal acceptance and certification requirements among referral sources and payors, both public and private, or (iii) if accepted, receive adequate reimbursement from such payors, anyone of which may limit the Partnership's ability to achieve profitability. The likelihood of the Partnership's success must be considered in light of these and other

5

challenges, expenses, complications and delays frequently encountered in connection with the formation of a new business and the development and commercialization of services in a competitive and regulated environment. No assurance can be given that the Partnership's plans for the Hospital will be effectuated, or if effectuated, will be successful.

Additionally, under the partnership agreement, each of the Northwest Doctors expressly warranted

[t]hat he is a sophisticated investor. . . . That the offer and purchase of his interest in the Partnership have been made in the course of a negotiated transaction involving direct communication between himself and the General Partner. . . . That he has either had experience in business enterprises or investments entailing risk of a type or to a degree substantially similar to those entailed in an investment in the Limited Partnership or has obtained independent financial advice with respect to investment in the partnership.

After the partnership agreement was executed, the Northwest Doctors were issued refund checks (drawn on Apex's checking account) repaying a portion of their bank loans and were given IRS forms from Apex for federal income tax return purposes. The Northwest Doctors were also given a letter from Apex verifying their investment and documenting their position as new limited partners.

The doctors did not secure the unconditional release or invest in the requisite number of units set forth in the final LOI. In September 2008, Apex informed the doctors that it would not establish a Northwest Houston LTACH.

In September 2009, Apex sought relief in federal court under Chapter 11 of the Bankruptcy Code. The Northwest Doctors, as partners in Apex, reached a

6

settlement with the bankruptcy trustee to recoup part of their investment from the bankruptcy estate. That settlement expressly carved out the claims the Northwest Doctors bring in this suit against Apex's original investors and operators.

## Discussion

### I. Rule 58 Joinder

Before reviewing the merits of the Northwest Doctors' summary-judgment appeal, we address their contention that the trial court improperly allowed Koch, Zaidi, Chagla, and Prestige Consulting to join in Shah's motions for summary judgment under Texas Rule of Civil Procedure 58. Rule 58 allows parties to adopt statements contained in any other pleading or motion so long as they have not been superseded by an amended pleading. TEX. R. CIV. P. 58. Because Rule 58 is a procedural tool designed to promote efficient case management, we review the trial court's use of it for an abuse of discretion. *See Allison v. Ark. La. Gas Co.*, 624 S.W.2d 566, 568 (Tex. 1981).

Rule 58 applies when the defendants share "a community of interest and identical defenses to appellants' claims." *Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 72 (Tex. App.—Houston [1st Dist.] 2009, no pet.). A Rule 58 joinder must be specific enough to provide notice of the joinder and the relief sought in the motion. *Id.* Parties routinely use Rule 58 in multiple-party lawsuits to adopt and join in the pleadings and motions of their co-parties. *State ex rel Grimes Cnty. Taxpayers*

*Ass'n v. Tex. Mun. Power Agency,* 565 S.W.2d 258, 264 (Tex. App.—Houston [1st Dist.] 1978, writ dism'd). Rule 58 promotes efficiency by providing a mechanism to avoid the excessive reproduction of exhibits where the co-parties claims or defenses rely on the same evidence. *Lockett*, 285 S.W.3d at 73.

Contrary to the Northwest Doctors' contention, a party seeking to join a motion under Rule 58 need not establish that it is in a position identical to that of the moving party. The Northwest Doctors' live petition alleges common facts and claims against the original investors as a group, giving rise to a community of interest among the original investors and operators. *See id.* Koch, Zaidi, Chagla, and Prestige Consulting gave adequate notice of their joinder, and there is no question of ambiguity. We hold that the trial court acted within its discretion in allowing Koch, Zaidi, Chagla, and Prestige Consulting to join in Shah's summary-judgment motion.

## II. Summary Judgment

### A. Standard of Review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accid. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of

law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Where, as here, the trial court's order does not state the specific grounds on which it granted summary judgment, we affirm the summary judgment if any of the grounds raised is meritorious. *See Provident Life*, 128 S.W.3d at 216.

Traditional summary judgment is proper only if the movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). The motion must state the specific grounds relied upon for summary judgment. *Id.* A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc.*, 941 S.W.2d at 911.

After adequate time for discovery, a party may move for a no-evidence summary judgment on the ground that no evidence exists to support one or more essential elements of a claim or defense on which the opposing party has the burden of proof. TEX. R. CIV. P. 166a(i). The trial court must grant the motion

9

unless the nonmovant produces summary judgment evidence raising a genuine issue of material fact. *Id.* More than a scintilla of evidence exists if the evidence "would allow reasonable and fair-minded people to differ in their conclusions." *Forbes Inc. v. Granada Bioscis., Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). To defeat a no‑evidence motion for summary judgment, the respondent is not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements. TEX. R. CIV. P. 166a(i) cmt.

## B. Fraud

The Northwest Doctors challenge the summary judgment on their fraud claim, arguing that the defendants falsely promised to establish a LTACH in Northwest Houston and to hold the Northwest Doctors' investments in a bank account separate from Apex's operating funds for use exclusively in furtherance of a Northwest Houston location.[2] The elements of fraud are (1) a material representation, (2) that is false, (3) known to be false when made, or made recklessly without knowledge of truth, (4) intended to be acted on, (5) relied on, and (6) that proximately causes injury. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).

The Northwest Doctors allege that the original investors made a "gentlemen's agreement" that the Northwest Doctors' investments would be placed

---

[2] For purposes of this appeal, we assume without deciding that the original investors may be held individually liable for the conduct alleged.

10

in a separate account and would be exclusively used for creating the Northwest Houston LTACH. The Northwest Doctors further allege that the original investors orally guaranteed that the doctors' investments would be returned if the Northwest Houston LTACH was not created. Shah, joined by other original investors, responds that the merger, disclaimer, and related clauses in the lease and partnership agreement disclaiming reliance on oral promises and identifying the risks associated with investing in the partnership legally bar the Northwest Doctors' fraud claim.

Whether an adequate disclaimer of reliance exists is a question of law. *Italian Cowboy Partners*, 341 S.W.3d at 333. Except under certain circumstances, where a "disclaimer lacks 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance' on the specific representations at issue," a written disclaimer will bar a fraudulent inducement claim. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). Factors relevant to considering whether a disclaimer clause has binding effect are: (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length

transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear. *Forest Oil*, 268 S.W.3d at 60.

Applying these factors to the summary-judgment evidence, we conclude that the written partnership and lease agreements preclude an actionable fraud claim. The lease agreement expressly disclaimed "any and all statements, projections, understandings, agreements, covenants, representations, and warranties, express or implied, between Lessor and Lessee." In the partnership agreement, the Northwest Doctors stipulated that they were sophisticated and experienced investors, and the agreement put them on notice of the risks attendant to their investments. The partnership agreement also contains substantive provisions that contradict the Northwest Doctors' claims. First, contrary to their allegation that the parties orally agreed to segregate the funds invested by the Northwest Doctors, the partnership agreement requires that funds be deposited into Apex's bank account, to be used exclusively "for the business of the Partnership (including distributions to the Partners)." Second, contrary to their allegation that the parties agreed to return the Northwest Doctors' funds if they were unsuccessful in establishing the Northwest Houston LTACH, the partnership agreement recites that "[n]o Partner shall have the right to withdraw, reduce, or demand the return of its [c]apital [c]ontributions except as provided in this [a]greement." The partnership agreement further recites that "there are no agreements, understandings, restrictions, representations or

12

warranties among the Partners other than those set forth herein." These provisions, taken as a whole, preclude as a matter of law reliance on any oral representations preceding the execution of the agreements and contradictory to their provisions. *See id.* Accordingly, we hold that the trial court properly granted summary judgment in favor of the original investors on the Northwest Doctors' fraud claims.

## C. Unjust enrichment

The Northwest Doctors next challenge the trial court's summary judgment on their unjust enrichment claim. They first contend that Noor, Odhav, and Reddy's no-evidence motion was inadequate. Texas Rule of Civil Procedure 166a(i) requires that a no-evidence motion specifically "state the elements as to which there is no evidence," and it prohibits "conclusory motions or general no-evidence challenges to an opponent's case." TEX. R. CIV. P. 166a(i).

Noor, Odhav, and Reddy's motion contended that no evidence showed they made any misrepresentation to the Northwest Doctors or that they received any personal benefit as a result of the transaction. A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). A key element of unjust enrichment is that the person sought to be charged wrongly secured or passively received a benefit. *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet.

denied).  It is not enough that the person sought to be charged received some incidental benefit.  *Bashara v. Baptist Mem'l. Hosp. Sys.,* 685 S.W.2d 307, 310 (Tex. 1985).  Noor, Odhav, and Reddy's no-evidence motion sufficiently identified the specific elements of unjust enrichment which, they contend, lack evidence.

The Northwest Doctors separately challenge the propriety of summary judgment on their unjust enrichment claim against general partner Koch.  The Doctors contend that Koch "had a significant economic interest to ensure [Apex's] success, and that the use of their investment funds for Apex's operations personally benefited him."  But the acquisition of operating capital for Apex through distribution of limited partnership interests does not create a personal benefit in the nature of unjust enrichment.

Regardless of whether Koch was aware of Apex's financial distress, the Northwest Doctors failed to adduce evidence that the influx of money resulting from Apex's existing plans to sell limited partnership units resulted in more than an incidental benefit to the original investors.  Koch's personal investment history with Apex illustrates this point.  Koch made a second investment in Apex at or near the same time the Northwest Doctors purchased their limited partnership units.  Like them, Koch signed the limited partnership agreement, and, like them, Koch lost his investment when Apex went bankrupt.  The Northwest Doctors and Koch were in the same position as other investors in the company, and the doctors

14

point to no evidence showing that Koch or any of the other original investors received an improper individual benefit or payment that the doctors did not. We therefore hold that the trial court correctly granted summary judgment in favor of the original investors on the doctors' unjust enrichment claim.

## Conclusion

We hold that the trial court correctly granted summary judgment in favor of the original investors. Accordingly, we affirm the judgment of the trial court.

All pending motions are dismissed as moot.


Jane Bland
Justice

Panel consists of Justices Higley, Bland, and Lloyd.