**Opinion issued June 22, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00477-CV

————————————

**DANIEL BRAND AND JAMES WELLS, Appellants**

**V.**

**SOJITZ CORPORATION OF AMERICA, Appellee**

On Appeal from the 152nd District Court
Harris County, Texas
Trial Court Case No. 2018-47552-A

## MEMORANDUM OPINION

Appellants, Daniel Brand and James Wells (collectively, "the workers"), challenge the trial court's rendition of summary judgment in favor of appellee, Sojitz Corporation of America ("SCA"), in the workers' suit against SCA for negligence,

gross negligence, and premises liability. In their sole issue, the workers contend that the trial court erred in granting summary judgment in favor of SCA.

We affirm.

## Background

In their first amended petition, the workers alleged that "[o]n or about May 2, 2018, [they] were working at a [p]lant" in LaPorte, Harris County, Texas (the "Metton LaPorte plant"). On that date, "operational issues were reported" about "equipment and ongoing operations" at the plant. But "[d]espite notice of equipment malfunction and potential hazards," SCA and others,[1] failed to take "adequate steps to evacuate [the workers], to minimize the potential hazards, or to adequately rectify the situation." Instead, the workers "and the other employees" were ordered "to continue work." "[A] significant explosion and fire occurred," resulting in serious injury to the workers. The workers "suffered injuries to their heads, arms, necks, backs and other parts of their bodies." They "also suffered from emotional disturbance as a result of their injuries, including anxiety, difficulty in focusing and concentration, and sleep disturbance."

---

[1]     The workers' first amended petition named SCA, Sojitz Energy Venture, Inc., and Metton America, Inc. ("Metton") as defendants. The workers eventually nonsuited their claims against Sojitz Energy Venture, Inc., and Metton filed its own summary-judgment motion related to the workers' claims against it, which the trial court denied. After the trial court granted SCA summary judgment, it severed the workers' claims against SCA from the underlying suit, and the workers appealed.

The workers brought claims against SCA for negligence, gross negligence, and premises liability. According to the workers, SCA had a duty to warn them of the "dangerous conditions" at the plant; "exercise reasonable care" to guard against "known and foreseeable hazards"; "provide a safe work environment"; protect them "from fire and/or explosion"; "adequately train [its] employees"; "adequately develop and implement appropriate policies and procedures"; "adequately supervise" its personnel; "timely recognize an emergency and/or hazardous situation"; and "provide adequate first aid and assistance." But SCA breached those duties and "[create]ed an unreasonably dangerous condition" that proximately caused the workers' injuries. Thus, the workers asserted that they were entitled to "recover for their injuries." And because SCA's "actions were done with a reckless disregard to a substantial risk of severe bodily injury," the workers argued, they were "entitled to exemplary damages" as well.

As to their premises-liability claim, the workers' alleged that SCA "owned, occupied and/or controlled the area where [the workers] were injured," were aware that the "condition of the area where [the workers] were injured posed an unreasonable risk of harm," and "had actual knowledge or reasonably should have known of the unreasonably dangerous condition." The workers, though, "did not have actual knowledge of the unreasonably dangerous condition." The workers argued that because they were invitees of SCA, SCA "had a duty to either warn"

3

them of the "unreasonably dangerous condition" or eliminate it. But SCA breached its duties, and its breach proximately caused the workers' injuries.

The workers sought damages "in excess of $1,000,000.00," including compensatory, actual, and consequential damages and recovery for "[p]ain and suffering," "[p]ast and future mental anguish," "[p]ast and future impairment," "[p]ast and future disfigurement," as well as exemplary damages.

SCA answered, generally denying the workers' allegations. SCA also attested in a verified denial that "SCA d[id] not own or operate the [Metton LaPorte plant] where the incident occurred and was not involved in the alleged events made the basis of [the workers'] suit." For those reasons, SCA "denie[d] that it [wa]s a proper party" to the workers' suit and it was not "liable in the capacity in which it [was] sued."

SCA then moved for summary judgment, asserting that it was entitled to judgment as a matter of law on the workers' claims against it and there was no evidence to support the workers' negligence, gross negligence, and premises liability claims. In its motion, SCA argued that it was entitled to judgment as a matter of law because it was "a wholly separate company from Metton," who was "the owner and operator of the [Metton LaPorte plant]" where the workers were injured. SCA was "a trading company," and its chemical division "purchase[d] resin materials for

4

liquid molding" manufactured by Metton. Thus, SCA maintained, it "ha[d] nothing to do with the plant or the allegations in [the workers'] lawsuit."

SCA attached to its summary-judgment motion a copy of the deposition testimony of its corporate representative, Tekashi Uesaka. In her deposition, Uesaka explained that SCA bought petroleum resin from U.S. manufacturers and sold it to its clients in Asia. According to Uesaka, SCA "invested in chemicals and traded chemical products"; it did not manufacture resin. Metton made "raw materials for plastic resin," and SCA sold some of the materials made by Metton.

According to Uesaka, SCA had a ninety-five percent investment in Metton's stock, and "Sojitz Europe" held the remaining five percent of Metton's stock. But SCA did not oversee the Metton LaPorte plant. Uesaka explained that "Metton ha[d] [its] own operation method" and "procedures," and SCA did not "give any opinions or comments to [Metton]" about those functions. SCA's role as to Metton was limited to "manag[ing]" or "see[ing] the results of [its] performance."

According to SCA, because the evidence showed that it "had no involvement in ownership or operations" of the Metton LaPorte plant, SCA did not "owe[] a duty, breach[] any duty," or "proximately cause[] the incident or injuries alleged by the [workers]." SCA also argued that because it did not own or occupy the Metton LaPorte plant, it could not be held liable under a premises-liability theory.

5

As to its no-evidence grounds, SCA asserted that the workers had no evidence that SCA owed them a legal duty, SCA breached any duty owed to the workers, and that any breach of a duty owed by SCA "proximately caused the accident and injuries." SCA also argued that the workers could not prove their premises-liability claim against SCA because there was no evidence that "SCA was the possessor[] of the premises," "[a] condition of the plant posed an unreasonable risk of harm," "SCA knew or reasonably should have known of the danger" posed by such condition, and SCA "fail[ed] to adequately warn" the workers of such condition or "fail[ed] to make the condition reasonably safe." Further, SCA maintained that there was no evidence that any breach by SCA "proximately caused the accident and injuries."

In their response to SCA's summary-judgment motion, the workers asserted that "[a] genuine issue of material fact exist[ed] as to whether [SCA] had actual control over the safety and security of workers at the [Metton LaPorte plant]." According to the workers, SCA "exercised control over the safety and security of the workers at the [Metton LaPorte plant] both generally and on . . . May 2, 2018."

As the they explained in their response, on May 2, 2018, the workers "were on assignment from their employers to work as independent contractors at the [Metton LaPorte plant]." They began their shift at 6:00 p.m. When they arrived at the plant, a batch of "component B in Tank 510" that had been made earlier in the day "was solidifying, which was extremely dangerous."

6

Eventually, the component B began "coming out" of "Tank 510," "which was serious cause for concern." A few Metton employees expressed concern, and two "stated that Tank 510 ha[d] reached its max[imum] temperature." A fourth Metton employee called the vice president of the Metton La Porte plant, Masanori Abe, as soon as he heard about the "problems with the tank."

Abe "arrived at the [Metton La Porte] plant," "assessed the situation," and "concluded that . . . Tank 510 was not going to explode." Abe then "informed Metton staff and other workers that it was safe to go back to work." Abe did not order an evacuation of the plant even though he knew "the temperature" inside the tank "was uncontrollably rising, creating a high risk that there could be an explosion and/or fire."

About an hour after Abe had assured the workers that it was safe to continue to work, Tank 510 exploded. "Brand was working on the truck loading area, which was approximately 50 feet" from where the tank exploded. "Wells was also near the tank . . . when the explosion occurred." "[T]he blast knocked both [workers] off their feet" and caused them to suffer serious injuries.

The workers noted that SCA was Metton's parent company and was "owned by Sojitz Japan." Further, "all upper management positions at Metton were assigned from Sojitz Japan," including that of vice president Abe. "Sojitz Japan" also "select[ed]" the president for the Metton LaPorte plant, who was "responsible for

ensuring the safety of workers at the plant." Thus, according to the workers, "Sojitz, not Metton, was in charge and control of safety" at the Metton LaPorte plant.

The workers attached to their response a copy of the deposition testimony of the Metton LaPorte plant's safety manager, Gwendolyn McNeil. McNeil testified that salaried Metton employees received an annual training from "Sojitz"[2] "[o]n the computer." Sojitz personnel had also come to the plant for training. On one occasion, "two employees from Sojitz New York" came to the Metton LaPorte plant and "attended the class" about "shipment of hazardous goods" with Metton employees Judy Johnson, the customer liaison who was also in charge of shipping, Beau West, the manager of the Metton LaPorte plant, vice president Abe, and McNeil. McNeil also testified that Sojitz representatives "would bring college students" from abroad into the Metton LaPorte plant for tours, and she would "do a safety presentation for [them]."

As to the tank that exploded, the workers noted that McNeil acknowledged in her deposition testimony that she did not know how often maintenance checks were performed to ensure that the safety valves on the tanks worked properly. According

---

[2]     "Sojitz" was defined earlier in McNeil's deposition by the workers' trial counsel as meaning a "Japanese organization" that was Metton's "parent company." This definition does not accurately refer to either "Sojitz Japan," which is the only Japanese entity identified in the record, or SCA, which holds the majority of Metton's stock.

to the workers, those "valves c[ould] play a critical role in preventing the very type of accident" that injured the workers.

The workers also attached to their response a copy of the deposition testimony of plant manager West, in which he stated that Sojitz bought the Metton LaPorte plant from Jim Brown sometime before 2002. According to the workers, West testified that "Metton did not follow its own policies and procedures or industry standards and failed to conduct" annual hazard studies from 2014 to 2018. West also testified that "there [wa]s no documentation showing that there was any routine maintenance, inspection, or repair of [Tank 510's] regulator" or "pressure release valve."

The workers asserted that "Sojitz ha[d] been staffing" the "upper management positions" at the Metton LaPorte plant "with Sojitz employees" from Japan "since approximately 2002." For instance, Abe was an "upper management employee placed at the [Metton La Porte plant] by Sojitz." According to the workers, "[n]umerous people testified" in their depositions that "they would have not gone back out" near Tank 510 had Abe not told them that "it was safe." That testimony made "clear that Sojitz, not Metton, was in charge" and in "control of safety at the [Metton LaPorte plant], and thus [owed the workers] a duty."

In SCA's reply to the workers' response to its summary-judgment motion, SCA reiterated that it "had no involvement" in Metton's "operations" and "did not

9

occupy the premises" of the Metton LaPorte plant. SCA was "a wholly separate company" from Metton. SCA emphasized that "Texas law presumes that two separate companies are . . . distinct legal entities," so "related companies in a corporate hierarchy cannot be treated as the same entity for liability purposes." For this reason, whether "Metton's upper management positions were assigned from Sojitz Japan" was "irrelevant" because those individuals were nonetheless "Metton employees." Such an "administrative act or decision by a parent company ha[d] no bearing" on the workers' claims against SCA. Thus, SCA asserted, there was "[n]o basis to attribute the actions of Abe," a Metton employee, to "impose liability on SCA under a negligent undertaking theory of liability."

SCA further observed that the sole exception to the rule that "parent corporations generally have no duty to control their subsidiaries . . . involves an undertaking by the parent company which directly promotes the interests of the subsidiary in providing a safe workplace." But because SCA "d[id] not oversee the operations at the Metton [LaPorte plant]," "the evidence presented by SCA show[ed] that there [wa]s no genuine issue of material fact on th[at] issue."

SCA also noted that the workers did not allege the elements of a negligent-undertaking claim in their live pleading. And "[e]ven if" the workers had "timely alleged" a negligent-undertaking claim, proof of their "cause of action would still require evidence that SCA undertook some action relevant to [the workers']

10

broader issues of plant safety." But according to SCA, there was "no support for the conclusion that SCA was . . . involved in the safety of the Metton [LaPorte plant]."

The trial court granted SCA summary judgment motion on the workers' negligence, gross negligence, and premises-liability claims against it, and SCA moved to sever the workers' claims against it from those the workers had brought against Metton. The trial court granted the severance, making the summary judgment final.

## Standard of Review

We review a trial court's decision to grant summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In conducting our review, we take as true all evidence favorable to the non-movants, and we indulge every reasonable inference and resolve any doubts in the non-movants' favor. *Valence Operating*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. When, as here, the trial court does not specify the grounds on which it granted summary judgment, we must affirm if any of the summary-judgment grounds are meritorious. *See Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

To prevail on a no-evidence summary-judgment motion, the movant must establish that there is no evidence to support an essential element of the

11

non-movants' claim on which the non-movants would have the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the non-movants to present evidence raising a genuine issue of material fact as to each of the elements challenged in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524. A no-evidence summary judgment may not be granted if the non-movants bring forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (internal quotations omitted). The trial court must grant a no-evidence summary-judgment motion if the movant asserts that there is no evidence of one or more specified elements of the non-movants' claim on which the non-movants would have the burden of proof at trial and the non-movants fail to file a timely response or fail to produce summary-judgment evidence raising a genuine issue of material fact on each challenged element. *See* Tex. R. Civ. P. 166a(i); *Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 67 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

To prevail on a matter-of-law summary-judgment motion, a movant has the burden of establishing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment on the plaintiffs' claim, it must either (1) disprove at least one essential element of the plaintiffs' cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiffs' cause of action. *Cathey*, 900 S.W.2d at 341; *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). Once the movant meets its burden, the burden shifts to the non-movants to raise a genuine issue of material fact precluding summary judgment. *See Siegler*, 899 S.W.2d at 197; *Transcont'l Ins. Co. v. Briggs Equip. Tr.*, 321 S.W.3d 685, 691 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

## Negligent Undertaking

In their sole issue, the workers argue that the trial court erred in granting summary judgment in favor of SCA on their negligence, gross negligence, and premises-liability claims because they raised a genuine issue of material fact as to

whether SCA assumed a duty of care to the workers by voluntarily undertaking the responsibility of providing the Metton LaPorte plant with safety training.

One who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured by the undertaking. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119–20 (Tex. 1976); *Torres v. Pasadena Ref. Sys., Inc.*, No. 01-18-00638-CV, --- S.W.3d --- , 2022 WL 17684333, at *13 (Tex. App.—Houston [1st Dist.] 2022, no pet.). To establish a negligent undertaking, the plaintiffs must show that: (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiffs' protection; (2) the defendant failed to exercise reasonable care in performing those services; and (3) either (a) the plaintiffs suffered harm because of their reliance on the defendant's performance or (b) the defendant's failure to exercise such care increased the plaintiffs' risk of harm. *Nall v. Plunkett*, 404 S.W.3d 552, 555–56 (Tex. 2013); *Torres*, 2022 WL 17684333, at *13.

To satisfy the duty element of a negligent-undertaking claim, the workers were required to present evidence raising a fact issue about whether SCA acted in a way that required the imposition of a duty where one otherwise would not exist. *See Nall,* 404 S.W.3d at 555; *Torres*, 2022 WL 17684333, at *13; *see also Bauer v. Gulshan Enters., Inc.*, 617 S.W.3d 1, 21 (Tex. App.—Houston [1st Dist.] 2020, pet.

14

denied) (recognizing absent special relationship or circumstances, Texas law generally imposes no duty to take action to prevent harm to others).

The workers first assert that safety manager McNeil's deposition testimony that Sojitz[3] provided annual online training and a class about "shipment of hazardous goods" for salaried employees of the Metton LaPorte plant raises a fact issue about whether SCA assumed a duty to provide the Metton LaPorte plant with safety training. Cases that have extended liability to a parent corporation for injuries to its subsidiary's employees based on an affirmative undertaking theory have "involved incidents where the parent corporation had engaged in an undertaking which directly promoted the interests of its subsidiary in providing a safe workplace." *Abdel-Fattah v. Pepsico, Inc.*, 948 S.W.2d 381, 385 (Tex. App.—Houston [14th Dist.] 1997, no writ); *see also Coastal Corp. v. Torres*, 133 S.W.3d 776, 780–81 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied) (parent company's refusal to budget funds allegedly necessary for maintaining safety of refinery did not constitute affirmative undertaking to control "safety duty" that refinery owed its employees); *Seay v. Travelers Indem. Co.*, 730 S.W.2d 774, 775, 780 (Tex. App.—Dallas 1987, no writ) (fact issue existed as to whether insurance company that had

---

[3] As noted previously, "Sojitz" was defined earlier in McNeil's deposition by the workers' trial counsel as meaning a "Japanese organization" that was Metton's "parent company." This definition does not accurately refer to either "Sojitz Japan," which is the only Japanese entity identified in the record, or SCA, which holds the majority of Metton's stock.

performed acts directly promoting insured's interest in safety of its boilers had duty to insured's employee, who was killed when boiler malfunctioned).

Here, Sojitz's training at the Metton LaPorte plant for shipment of hazardous goods—a subject that for SCA, as a buyer and seller of resins, is within its wheelhouse—is not the same as safety training for operating a resin manufacturing plant. As to the Metton LaPorte plant operations, SCA's corporate representative Uesaka testified that "Metton ha[d] [its] own operation method" and "procedures," and SCA did not "give" Metton "any opinions or comments" about how Metton operated its LaPorte plant. Uesaka's testimony on this issue was uncontroverted. Thus, McNeil's testimony about classes for "shipment of hazardous goods" and other unspecified classes does not raise a fact issue as to whether SCA assumed a duty to provide the Metton LaPorte plant and its workers with safety training for plant operations. *See Nall*, 404 S.W.3d at 555; *Torrington Co.*, 46 S.W.3d at 838–39.

The workers also argue that they raised a fact issue as to whether SCA undertook a duty to provide the workers with a safe working environment because Abe, who made the decision not to evacuate the Metton LaPorte plant on May 2, 2018, was assigned by "Sojitz Japan" to serve as the plant's vice president. But no evidence ties Sojitz Japan's assignment of the Metton LaPorte plant's upper management to any conduct of SCA, and the mere fact that a corporation may be a

subsidiary does not automatically render it liable for the actions or obligations of its parent. On the contrary, because Texas law presumes that even related corporations are separate entities, "[t]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002); *see also SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008) ("We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse . . . .").

For example, in *Abdel-Fattah v. PepsiCo, Inc.*, the plaintiff—an employee of PepsiCo's wholly-owned subsidiary, Taco Bell—alleged that in hiring the chief executive officer ("CEO") and president of Taco Bell, PepsiCo undertook an affirmative act that created a duty to use reasonable care in hiring Taco Bell's employees. 948 S.W.2d 381, 383, 385 (Tex. App.—Houston [14th Dist.] 1997, no writ). According to the plaintiff, PepsiCo was negligent in hiring Taco Bell's CEO and president, and thus was liable for injuries inflicted on the plaintiff by a Taco Bell employee who had been negligently hired during the CEO and president's tenure. *Id.* at 385.

Our sister appellate court acknowledged that the hiring of Taco Bell's CEO and president could be considered as an affirmative undertaking by PepsiCo for Taco

Bell's benefit. *Id.* But because the hiring of an executive was not an undertaking that directly promoted Taco Bell's interest in providing a safe workplace, the court concluded that it was not "an undertaking that would justify extending a legal duty on the part of PepsiCo to oversee the daily management" of Taco Bell's employees. *Id.* Thus, the court held that there was no basis for imposing a legal duty on PepsiCo to protect the plaintiff from an injury inflicted by a fellow Taco Bell employee. *Id.*; *see also Ross Stores, Inc. v. Miller*, 612 S.W.3d 682, 690–91 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (absent showing of direct participation by parent company in circumstances precipitating injury to employee of subsidiary, there was no basis for concluding that parent company was required to protect subsidiary's employee). Similarly, here, Sojitz Japan's selection of upper management, including Abe, for the Metton LaPorte plant is no evidence that SCA exercised any control over the Metton LaPorte plant's operations or voluntarily undertook a duty to ensure that the plant operated safely.

Because there is no evidence that SCA owed the workers a duty of care, we hold that the trial court did not err in granting summary judgment in favor of SCA on the workers' claims against it.

We overrule the workers' sole issue.

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Countiss and Rivas-Molloy.